AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

E-FILED

Wednesday, 08 January, 2020 08:53:38 AM
Clerk, U.S. District Court, ILCD

E-FILED
Tuesday, 07 January, 2020 04:39:18 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 20-MJ- 3001 |
| The residence located at 4001 Sandhill Road, Lot 115, Springfield, Illinois, including any appurtenances and storage units/outbuildings in or on the premises; the person of John Thomas Daniel, Sr.; and a 1995 Plymouth van. Illinois registration 6188859. | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached hereto and incorporated by reference.

located in the _____Central_____ District of _____Illinois_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached hereto and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2252 and 2252A | Production, Distribution, Receipt and Possession of Child Pornography |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ERIC V BOWERS  Digitally signed by ERIC V BOWERS
Date: 2020.01.04 10:52:39 -06'00'

*Applicant's signature*

Special Agent Eric V. Bowers

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone and electronic mail_____ *(specify reliable electronic means)*.

Date: ____1/7/2020____

s/Eric Long

*Judge's signature*

City and state: ____Urbana, IL by phone____

United States Magistrate Judge Eric I. Long

*Printed name and title*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| IN RE SEARCH OF:<br><br>The residence located at 4001 Sandhill Road, Lot 115, Springfield, Illinois, including any appurtenances and storage units/outbuildings in or on the premises; the person of John Thomas Daniel, Sr.; and a 1995 Plymouth van, Illinois registration 6188859. | Case No. 20-mj-3001<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Eric Bowers, being first duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Department of Homeland Security (DHS),

Homeland Security Investigations (HSI), currently assigned to the Resident Agent in

Charge in Springfield, Illinois. I have been so employed since December 2006. As part

of my daily duties as an HSI Special Agent, I investigate criminal violations relating to

child exploitation and child pornography, including violations pertaining to the illegal

production, distribution, receipt and possession of child pornography, in violation of 18

U.S.C. §§ 2252 and 2252A. I have received training in the area of child pornography and

child exploitation and have had the opportunity to observe and review numerous

examples of child pornography (as defined in 18 U.S.C. § 2256) in various forms of

media including computer media. I have been the Affiant of and participated in the

1

3:20-mj-03001-TSH *SEALED* # 1 Page 3 of 35

execution of numerous search warrants which involved child exploitation and/or child pornography offenses.[1]

2.      This affidavit is made in support of an application for warrants to search:

a.      **The Subject Premises**: The residence located at 4001 Sandhill Road, Lot 115, Springfield, Illinois, including any appurtenances and storage units/outbuildings in or on the premises ("SUBJECT PREMISES"). The SUBJECT PREMISES to be searched is more particularly described as: a single wide mobile home with white metal siding and brown metal shutters on the windows, located at Lot 115 in the North Oaks mobile home community at 4001 Sandhill Road, Springfield, Illinois. The number "115" is located on the southwest corner of the mobile home. There is a small wood storage building, with white siding, on the west side of the mobile home. The residence is the first mobile home east of North Oaks Drive, on the north side of Burr Oak Lane, in Springfield, in Sangamon County, Illinois. See Attachment A1. The items to be searched for and seized at the SUBJECT PREMISES are set forth in Attachment B.

b.      **The Subject Person** (a pat-down search of the resident of the SUBJECT PREMISES for any digital devices): The person of John Thomas DANIEL SR.,

---

[1] The Seventh Circuit Court of Appeals made arguably adverse credibility findings regarding this witness in *United States v. Slaight*, 620 F.3d 816 (7th Cir. 2010). To the extent that the opinion reflects on the testimonial credibility of the agent, the United States respectfully disagrees. The United States further notes that, in the underlying district court case, the district court found the Affiant's testimony credible and there was no finding by the *Slaight* Court that the district court's credibility finding was clearly erroneous.

DOB 04/30/1947, ("SUBJECT PERSON"). See Attachment A2. The items to be searched for and seized at SUBJECT PERSON are set forth in Attachment B.

        c.    **The Subject Vehicle** (registered to the resident of the Subject Premises): One motor vehicle which is more particularly described as a 1995 Plymouth van, Illinois registration 6188859 ("SUBJECT VEHICLE"), which is registered to John T. DANIEL, SR. at the SUBJECT PREMISES. See Attachment A3. The items to be searched for and seized at SUBJECT VEHICLE are set forth in Attachment B.

        3.    The purpose of this application is to seize evidence of violations of 18 U.S.C. §§ 2252 and 2252A, which among other things, makes it a crime to possess, receive, and distribute child pornography, which has traveled in interstate commerce via the Internet by means of a computer.

        4.    I am familiar with the information contained in this Affidavit based upon the investigation I have assisted in and based on my conversations with other law enforcement officers involved in this investigation.

        5.    Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252 and 2252A are located at the SUBJECT PREMISES, the SUBJECT PERSON, and/or the SUBJECT VEHICLE. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

3

3:20-mj-03001-TSH *SEALED*   # 1    Page 5 of 35

6.     As a result of the instant investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§ 2252 and 2252A, are present at the SUBJECT PREMISES, the SUBJECT PERSON, and / or the SUBJECT VEHICLE.

7.     The investigation has revealed that in December 2019, an individual, using an electronic device that was traced to the SUBJECT PREMISES, did possess and distribute child pornography whereby child pornography images were provided through the internet that were downloaded by HSI Special Agent (SA) Eric Bowers through the use of an Undercover Investigative Software ("UIS").

## BACKGROUND OF PEER-TO-PEER FILE SHARING

8.     A growing phenomenon on the Internet is peer to peer file sharing ("P2P").  P2P file sharing is a method of communication available to Internet users through the use of special software.  The software is designed to allow users to trade digital files through a worldwide network that is formed by linking computers together. There are numerous P2P networks currently operating (such as Gnutella, eDonkey, and Ares) and likewise numerous different software applications that can be used to access these networks, but these applications operate in essentially the same manner.

9.     To access the P2P networks, a user first obtains the P2P software, which can be downloaded from the Internet.  This software is used for the purpose of sharing digital files.  When the P2P software is installed on a computer, the user is directed to specify a "shared" folder.  All files placed in that user's "shared" folder are available to anyone on the world-wide network for download.   Most P2P software gives each user

4

3:20-mj-03001-TSH *SEALED*   # 1    Page 6 of 35

a rating based on the number of files he/she is contributing to the network. This rating affects the user's ability to download files. The more files a user is sharing, the greater his/her ability is to download files. This rating system is intended to encourage users to "share" their files, thus propagating the P2P network. However, a user is not required to share files to utilize the P2P network.

10.    A user generally obtains files by conducting keyword searches of the P2P network. When a user initially logs onto the P2P network, a list of the files that the user is sharing is transmitted to the network. The P2P software then matches files in these file lists to keyword search requests from other users. A user looking to download files simply conducts a keyword search. The results of the keyword search are displayed and the user then selects file(s) which he/she wants to download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer(s) hosting the file. Once a file has been downloaded, it is stored in the area previously designated by the user and will remain there until moved or deleted. Most of the P2P software applications keep logs of each download event. Often times a forensic examiner, using these logs, can determine the IP address from which a particular file was obtained.

11.    A person interested in sharing child pornography with others in the P2P network, need only place those files in his/her "shared" folder(s). Those child pornography files are then available to all users of the P2P network for download regardless of their physical location. A person interested in obtaining child pornography can open the P2P application on his/her computer and conduct a

keyword search for files using a term such as "preteen sex." The keyword search would return results of files being shared on the P2P network that match the term "preteen sex." The user can then select files from the search results and those files can be downloaded directly from the computer(s) sharing those files.

12.     The computers that are linked together to form the P2P network are located throughout the world; therefore, the P2P network operates in interstate and foreign commerce. A person that includes child pornography files in his/her "shared" folder is hosting child pornography and therefore is promoting, presenting, and potentially distributing child pornography. A person that hosts child pornography is in violation of Title 18 Section 2252A(a)(3)(B) in that he/she is promoting and presenting child pornography in interstate and foreign commerce by means of a computer.

13.     One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel. This means that the user can download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a user downloading an image file may actually receive parts of the image from multiple computers. This reduces the time it takes to download the file. A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address is unique to a particular Internet connection during an online session. The IP address provides a unique location making it possible for data to be transferred between computers.

14.     Even though the P2P network links together computers all over the world and users can download files, it is not possible for one user to send or upload a file to

6

another user of the P2P network. The software is designed only to allow files to be downloaded that have been selected. One does not have the ability to send files from his/her computer to another user's computer without the permission or knowledge of the "receiving" user. Therefore, it is not possible for one user to send or upload child pornography files to another user's computer without the other person's active participation.

15. A forensic examiner can often recover evidence, which shows that a computer contains peer-to-peer software, when the computer was sharing files, and even some of the files which were uploaded or downloaded.

## BACKGROUND OF UNDERCOVER INVESTIGATIVE SOFTWARE

16. This investigation of P2P file-sharing networks is a cooperative effort of law enforcement agencies around the country. Many of these agencies are associated with the Internet Crimes Against Children Task Force Program. Many of the officers involved in this effort are using the technology and methods described herein. This methodology has led to the issuance and execution of search warrants around the country resulting in many seizures of child pornography and arrests for possession and distribution.

17. Special Agent (SA) Eric Bowers initiated this investigation using the Child Protection System (CPS) suite of tools. CPS is a database utilized by federal and state law enforcement agencies in child exploitation investigations nationwide. This software is designed by and for law enforcement and only available to law enforcement officers who have attended the appropriate training, as SA Bowers has done. CPS

3:20-mj-03001-TSH *SEALED*  # 1  Page 9 of 35

maintains a log of IP addresses that have been previously involved in the possession and distribution of child pornography. SA Bowers has used this software for over 8 years.

18.     Files which are transiting the P2P networks are automatically compared to a known set of hash values as contained in the CPS database that evidence child pornography, as identified from previous investigations by other law enforcement officers. The data which is acquired from the suspect computer, including hash value, IP address, name of the file, and date and time it was identified by CPS, are all compiled into a user friendly interface.

19.     During this authorized undercover investigation and in addition to CPS, SA Bowers employed the use of a UIS, which is currently used in federal, state and local P2P file sharing investigations. The UIS is designed to connect directly to one IP address and browse or download from one specific peer at a time. The UIS is a P2P file sharing client similar to other file sharing clients (like Shareaza or eMule), which are free and available to the public.

20.     Using source code from a free P2P client, the UIS was modified by/for law enforcement to meet the stringent investigative requirements of these cases. For example, the UIS will only download files from a single source (the target IP), while the public version will download from many sources. The UIS thus takes much longer to download files because of the single source limitation. The UIS uses only publicly available P2P options which follow the programming language (protocols) set forth in the public P2P protocol standards. No functionality outside of the publicly available

8

protocols is added, thus eliminating any potential private intrusion on the suspect IP's computer or files. The UIS uses the same code and language that is available to any and all software developers.

21.    Upon locating an IP address on the P2P networks that is evidencing SHA-1 hash values of known images/videos of child pornography, the IP address is launched into the UIS by the investigator. An automated function of the UIS will attempt to connect to the IP address when it is observed being "on-line" and send a request to browse (i.e. look at and log the information being transmitted and/or shown by that IP) and/or download a file from the shared folder of the computer utilizing that IP address. If the connection is not made to either browse or download, the UIS automatically continues to attempt to make a connection with the IP address.

22.    If a connection is made with the suspect IP address, the UIS will log the connection. It will also log the browse and/or download in the "logs" – the activity associated to IP activity. Files are then downloaded directly into the investigator's computer and segregated from any other evidence. Prior to beginning an investigation using the UIS, the investigator (in this case SA Bowers) creates a folder structure on the hard drive of his computer instructing the UIS to the file path of where to store files that are downloaded and logs that are created. Both the downloaded files themselves as well as logs will be reported in the appropriate folders created by the investigator for the target peer IP address. The logs identify that a known SHA-1 value of child pornography has been located, that the download transfer started, that the transfer is in fact processing, and that the transfer of the file is complete. The length of time the

download process takes depends on the size of the file and speed of the target IP's and the investigator's respective internet service and/or computer.

23.     When a file has successfully completed the download process the UIS notifies the investigator.  The UIS, being based on P2P program design, ensures that files are obtained directly from the target IP address, assuring a single-source download so that any downloaded file comes directly from the Subject IP address.

24.     The investigator personally reviews all downloaded files and identifies those files that meet the definition of child pornography, as defined by that investigator's jurisdiction.

25.     SA Bowers has validated the UIS by conducting investigations manually using publicly available P2P clients and comparing the results with the automated UIS process and finding the results to be exactly the same.

### PROBABLE CAUSE

#### July 2013

26.     In and around May 2013, SA Bowers conducted an authorized online undercover investigation involving the peer-to-peer distribution of child pornography in the Central District of Illinois.

27.     SA Bowers downloaded suspected child pornography files from an electronic device utilizing an IP address that was traced to the SUBJECT PREMISES.

28.     On July 14, 2013, RAC Springfield agents executed a search warrant at the SUBJECT PREMISES and encountered John Daniel, Jr. (DOB 07/24/1971) and SUBJECT PERSON inside the residence.

3:20-mj-03001-TSH *SEALED*  # 1   Page 12 of 35

29.     John Daniel Jr. waived his Miranda rights and consented to voluntary interview. Daniel Jr. denied that he had any knowledge of or involvement with the downloading / possessing of child pornography files at the SUBJECT PREMISES.

30.     SUBJECT PERSON waived his Miranda rights and consented to a voluntary interview. SA Bowers asked SUBJECT PERSON if he had any knowledge of child pornography at the residence and SUBJECT PERSON responded "I download it all the time, but I don't, you know, I don't watch it again. It's just something that passes my time. I know it's illegal, and I screwed up."

31.     SUBJECT PERSON identified his computer as the HP desktop computer that was in the living room of the residence. SUBJECT PERSON stated that he had been using P2P programs to download child pornography for approximately 5 years, and that he was currently using the P2P program Shareaza. He stated that he had used the program as recently as the prior night. He stated that he used search terms that he knew were associated with child pornography material; such as PTHC, PTSC, hussyfan, and pedo. SUBJECT PERSON stated that his peer-to-peer program is running "24/7" and that he is downloading all the time.

32.     SA Bowers asked SUBJECT PERSON how he would define child pornography and he said, "illegal." SUBJECT PERSON further clarified his definition of child pornography as kids under the age of 18 showing their genitals or engaging in sexual activity.

33.     SUBJECT PERSON stated that he knew how P2P file sharing worked and that he was aware that files in his default download folder were being shared with

11

3:20-mj-03001-TSH *SEALED*   # 1   Page 13 of 35

other P2P users. He stated that he had never taken any steps to change his P2P program so that he would not share his files with other users.

34.    SUBJECT PERSON stated that he viewed the child pornography files in the default download folder and after viewing he would delete most of them. The files that were not deleted he then transferred from the computer to an external hard drive. SUBJECT PERSON stated that his son had no knowledge that his father was downloading and viewing child pornography.

35.    SUBJECT PERSON stated that he had a preference for females from 3 to 15 years old, and stated that he has specifically searched peer-to-peer for 6 year olds and 9 year olds. He stated that he likes the clean look of prepubescent females, because they haven't yet developed pubic hair.  SUBJECT PERSON stated that he had a combination of adult and child pornography on his computer.

36.    SUBJECT PERSON stated that the child pornography videos that he chose to keep were ones in which the videos also had an audio component. SUBJECT PERSON stated that he liked videos in which he could hear the sounds of sexual activity occurring between the children and adults, specifically he stated that he liked hearing "the gratification of the girl". He recalled one video that he had viewed in which a 3 year old female was being anally penetrated by an adult male penis. SA Bowers asked if the child could be heard crying or screaming as this was occurring and SUBJECT PERSON stated that the child was not crying or screaming, although he conceded that this must have been extremely painful for the child. SA Bowers asked if SUBJECT PERSON felt that it was okay for a 3 year old to have anal sex as long as she

12

didn't cry or scream and SUBJECT PERSON said, "That's the way I felt, yeah."
SUBJECT PERSON stated that he had no desire to ever physically molest a child. He
stated it was just a fantasy world that he lived in when he watched the child
pornography.

37.      During the interview SUBJECT PERSON made statements which
indicated that he was suffering from cancer.  These statements were corroborated by his
son.  At the conclusion of the interview, Daniel Jr. and SUBJECT PERSON were
released.

38.      This case was not presented for prosecution.

<u>November 2019</u>

39.      Beginning in November 2019, SA Bowers conducted an authorized online
undercover investigation involving the peer-to-peer distribution of child pornography
in the Central District of Illinois.

40.      On December 2, 2019, at approximately 9:35 am Central, Central, SA
Bowers, utilizing the UIS, directly connected to IP address 73.22.23.19 and completed a
single source download of the following image file:

File name:  little cutie12.jpg
(sha1:EPM33ZTET3HR46YUMFZNZXLSUPDEAW2H)
This image file shows a naked girl, approximately 6-8 years old, who is sitting
back on a chair.  She is resting on her left arm and her legs are spread wide,
exposing her genitals.

3:20-mj-03001-TSH *SEALED*   # 1   Page 15 of 35

41.     On December 2, 2019, at approximately 9:35 am Central, Central, SA

Bowers, utilizing the UIS, directly connected to IP address 73.22.23.19 and completed a

single source download of the following image file:

> File name: little cutie 18.jpg
> (sha1:P4PYSNF7TPK2CWUMPD5TVEHRVHFL44NK)
> This image file shows a girl, approximately 6-8 years old, who appears to be
> naked. She is sitting down and leaning back against pillows. A naked adult
> male is in front of her. The male's penis is in the girl's mouth.

42.     On December 2, 2019, at approximately 9:35 am Central, Central, SA

Bowers, utilizing the UIS, directly connected to IP address 73.22.23.19 and completed a

single source download of the following image:

> File name: little cutie 8.jpg
> (sha1:3MV4OH37ZIJMNZDRKLQPNWIMI7FZMWGY)
> This image file shows a girl, approximately 8-10 years old. Her mouth is open
> and an adult male's penis appears to be touching the girl's mouth.

43.     On December 2, 2019, at approximately 9:35 am Central, Central, SA

Bowers, utilizing the UIS, directly connected to IP address 73.22.23.19 and completed a

single source download of the following image:

> File name: little cutie 2.jpg
> (sha1:4XOS5DACAS7PJL3KVGQITIUHA7C3IUNE)
> This image file shows a girl, approximately 8-10 years old. She is naked and
> laying on her back on a bed. Her arms are raised above her head and her wrists
> are tied together with a yellow rope. Her legs are spread wide, thereby exposing
> her genitals. There is a yellow rope around each of her legs, which binds her
> thigh to her calf.

44.     While directly connected to the computer at IP address 73.22.23.19 on

December 2, 2019, the UIS identified the P2P client running on that computer as

"Shareaza 2.7.10.2". The Global Unique Identifier (GUID)[2] was shown as
"4F0868BB94AEAE468034147A973D2496". The account profile showed the user's
nickname as "John" and the demographic information showed "male, 72".

45.     Your Affiant reviewed the downloaded files and believes, based on his
training and experience, that all of the files contain child pornography as defined in
Title 18, United States Code, Section 2256(8).

46.     Your Affiant determined that IP address 73.22.23.19 was assigned to
Comcast Communications, Moorestown, New Jersey.

47.     Records provided by Comcast Communications, in response to a DHS
Summons, showed that IP address 73.22.23.19 was assigned to SUBJECT PERSON at the
SUBJECT PREMISES, from June 10, 2019, to at least December 5, 2019.

48.     On December 6, 2019, your Affiant checked the Illinois Secretary of State
database and found that SUBJECT PERSON showed to have a valid Illinois Driver's
License with a listed address at the SUBJECT PREMISES. Additionally, the SUBJECT
VEHICLE is registered to SUBJECT PERSON at the SUBJECT PREMISES.

49.     On December 9, 2019, a law enforcement officer conducted surveillance at
the SUBJECT PREMISES and observed the SUBJECT VEHICLE parked at the residence.

---

[2] A Global Unique Identifier (GUID) is assigned to the computer when a file sharing
program (such as Shareaza) is placed onto the computer. This series of numbers and letters is
unique to each computer running the program around the world. Should the computer be used
to access the internet from a different IP address the GUID will remain the same as it is intrinsic
to the computer system. Further, should the user of the computer update the file sharing
program with a newer version, a new GUID will be assigned to the computer for the updated
program.

3:20-mj-03001-TSH *SEALED*   # 1   Page 17 of 35

## COMPUTERS, ELECTRONIC STORAGE,
## AND FORENSIC ANALYSIS

50.    As described above and in Attachment B, this application seeks permission to search for records that might be found at the SUBJECT PREMISES, on the SUBJECT PERSON, or in the SUBJECT VEHICLE in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the search and seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

51.    *Probable cause*. I submit that if a computer or storage medium is found at the SUBJECT PREMISES, on the SUBJECT PERSON, or in the SUBJECT VEHICLE, there is probable cause to believe relevant records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

52.      *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium at the SUBJECT PREMISES, on the SUBJECT PERSON, or in SUBJECT VEHICLE because:

3:20-mj-03001-TSH *SEALED*  # 1    Page 19 of 35

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant

18

3:20-mj-03001-TSH *SEALED*  # 1   Page 20 of 35

at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent

19

3:20-mj-03001-TSH *SEALED*   # 1    Page 21 of 35

to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

   c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

3:20-mj-03001-TSH *SEALED*  # 1   Page 22 of 35

f.      I know that when an individual uses a computer to receive or possess child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

53. *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.

21

3:20-mj-03001-TSH *SEALED*   # 1    Page 23 of 35

Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.  Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

    54.  *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence

3:20-mj-03001-TSH *SEALED*  # 1  Page 24 of 35

described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

55.    Based on my own experience and consultation with other agents who have been involved in the search of computers (and other devices capable of storing digital media, such as telephones, tablets, and other mobile devices) and the retrieval of data from computer systems and related peripherals, it is common for such items to be transported or stored in automobiles. Further, it is common for such items to be stored in common storage areas of a residence, including garage areas when those devices have been broken or replaced by newer equipment. Further, even when these digital media devices have been stored for months or years, digital evidence can often be recovered from them.

### CHARACTERISTICS OF INDIVIDUALS WHO COLLECT IMAGES

56.    Based upon my own knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

a.    Child pornography collectors may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may

3:20-mj-03001-TSH *SEALED* # 1 Page 25 of 35

have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b. Collectors of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Collectors of child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d. Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly. Child

3:20-mj-03001-TSH *SEALED*  # 1   Page 26 of 35

pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names and contact information of individuals with whom they have been in contact and who share the same interests in child pornography.

      f.    Collectors of child pornography prefer have continuous access to their collection of child pornography. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

57.    Based upon the conduct of individuals involved in the collection of child pornography set forth above, namely, that they tend to maintain their collections at a secure, private location for long periods of time, there is probable cause to believe that evidence of the offenses of receiving and possessing child pornography is currently located at the SUBJECT PREMISES, the SUBJECT PERSON, and / or the SUBJECT VEHICLE.

## CONCLUSION

58.    Based on the above information, there is probable cause to believe that 18 U.S.C. §§ 2252 and 2252A, which, among other things, make it a federal crime for any person to knowingly possess, receive, or distribute child pornography, have been violated, and that the property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the SUBJECT

PREMISES, the SUBJECT PERSON, and / or the SUBJECT VEHICLE, which are more fully described in Attachments A1, A2, and A3 of this Affidavit.  This Affiant requests authority to seize and search such material.

      59.     Based upon the foregoing, this Affiant respectfully requests that this Court issue search warrants for:

      a.     the SUBJECT PREMISES, as described in Attachment A1, authorizing the search for and seizure of the items described in Attachment B;

      b.     the SUBJECT PERSON, as described in Attachment A2, authorizing the search for and seizure of the items described in Attachment B.

      c.     the SUBJECT VEHICLE, as described in Attachment A3, authorizing the search for and seizure of the items described in Attachment B.

FURTHER YOUR AFFIANT SAYETH NOT

ERIC V BOWERS  Digitally signed by ERIC V BOWERS
Date: 2020.01.03 10:20:48 -06'00'

Eric V. Bowers
Special Agent
Department of Homeland Security
Homeland Security Investigations

Subscribed and sworn  before me this ___7___th day of January, 2020.

   s/Eric Long

Eric I. Long
United States Magistrate Judge
Central District of Illinois

26

3:20-mj-03001-TSH *SEALED*   # 1   Page 28 of 35

## ATTACHMENT A1
## DESCRIPTION OF LOCATION TO BE SEARCHED

The SUBJECT PREMISES to be searched is more particularly described as: a single wide mobile home with white metal siding and brown metal shutters on the windows, located at Lot 115 in the North Oaks mobile home community at 4001 Sandhill Road, Springfield, Illinois. The number "115" is located on the southwest corner of the mobile home. There is a small wood storage building, with white siding, on the west side of the mobile home. The residence is the first mobile home east of North Oaks Drive, on the north side of Burr Oak Lane, in Springfield, in Sangamon County, Illinois.



**ATTACHMENT A2**
**DESCRIPTION OF LOCATION TO BE SEARCHED**

The SUBJECT PERSON is John Thomas DANIEL SR., DOB 04/30/1947, pictured

below.



**Name:** JOHN THOMAS DANIEL SR
**Street:** 4001 SANDHILL RD LOT 115
**City:** SPRINGFIELD
**Zip:** 62702
**Date Of Birth:** 04/30/1947
**Gender:** MALE

28

3:20-mj-03001-TSH *SEALED*  # 1   Page 30 of 35

**ATTACHMENT A3**
**DESCRIPTION OF LOCATION TO BE SEARCHED**

The SUBJECT VEHICLE is more particularly described as a 1995 Plymouth van,

Illinois registration 6188859, which is registered to SUBJECT PERSON at the SUBJECT

PREMISES.



**ATTACHMENT B**
**ITEMS TO BE SEARCHED FOR AND SEIZED**

1.      Evidence, instrumentalities, and contraband concerning violation of Title 18, United States Code, Section 2252 and 2252A; including images / videos of child pornography and files containing images / videos of child pornography in any form wherever they may be stored or found;

2.      Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, video recording devices, video recording players, and/or monitors. The following definitions apply to the terms as set out in this affidavit and attachment:

        a.      *Computer Hardware*. Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data-processing devices (including but not limited to central processing units; internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, cellular telephones and mobile electronic devices, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, cable modems, wireless network routers, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

30

3:20-mj-03001-TSH *SEALED*   # 1    Page 32 of 35

b.      *Computer Software*. Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

c.      *Documentation*. Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

d.      *Passwords and Data Security Devices*. Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

3.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.      evidence indicating the computer user's state of mind as it relates to the crimes under investigation;

f.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.      evidence of the times the COMPUTER was used;

i.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

32

j.      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.      records of or information about Internet Protocol addresses used by the COMPUTER;

l.      records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.      contextual information necessary to understand the evidence described in this attachment.

4.      Any and all notes, documents, records, or correspondence pertaining to child pornography as defined under Title 18, United States Code, § 2256(8).

5.      Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by use of the computer and/or for the purpose of distributing child pornography.

6.      Any and all correspondence identifying persons transmitting, through interstate commerce including by United States Mails or by computer, any visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, § 2256(2).

8.      Any and all records, documents, invoices and materials that concern any accounts with any Internet Service Provider.

9.      Any and all cameras, film, or other photographic equipment.

33

10.    Any and all visual depictions of minors.

11.    Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce including by United States Mails or by computer, and visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, § 2256(2).

12.    Any and all address books, names, and lists of names and addresses of minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, § 2256(2).

13.    Any and all documents, records, or correspondence pertaining to occupancy at SUBJECT PREMISES and documentation related to the ownership / dominion of the SUBJECT VEHICLE.

14.    Any and all cell phones, tablets, or mobile devices and the content, data and information contained in said devices to include any storage media, such as SD cards and Micro SD cards and the like.

16.    Any of the items described in paragraphs 1 through 15 above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment, including floppy diskettes, fixed hard disks, or removable hard disk cartridges, software or memory in any form.